RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0280p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SISTER MICHAEL MARIE; SISTER MARY CABRINI,

        *Plaintiffs-Appellants*,

    *v.*

AMERICAN RED CROSS; ROSS COUNTY EMERGENCY MANAGEMENT AGENCY; MARY MCCORD; DAVID BETHEL,

        *Defendants-Appellees*.

No. 13-4052

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:11-cv-00474—Michael H. Watson, District Judge.

Argued: August 7, 2014

Decided and Filed: November 14, 2014

Before: ROGERS and GRIFFIN, Circuit Judges; VAN TATENHOVE, District Judge.[*]

---

## COUNSEL

**ARGUED:** Thomas I. Blackburn, BUCKLEY KING LPA, Columbus, Ohio, for Appellants. F. Joseph Nealon, ECKERT, SEAMANS, CHERIN & MELLOTT, LLC, Washington, D.C., for American Red Cross Appellees. Jeffrey A. Stankunas, ISAAC WILES BURKHOLDER & TEETOR, LLC, Columbus, Ohio, for Ross County Appellees. **ON BRIEF:** Thomas I. Blackburn, BUCKLEY KING LPA, Columbus, Ohio, for Appellants. Jeffrey W. Larroca, Michael A. Graziano, ECKERT, SEAMANS, CHERIN & MELLOTT, LLC, Washington, D.C., for American Red Cross Appellees. Jeffrey A. Stankunas, Julia R. Baxter, ISAAC WILES BURKHOLDER & TEETOR, LLC, Columbus, Ohio, for Ross County Appellees.

---

[*]The Honorable Gregory F. Van Tatenhove, United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

---

**OPINION**

---

GREGORY F. VAN TATENHOVE, District Judge.   Under what circumstances are volunteers protected from employment discrimination by Title VII?   That is the primary, though not only, question presented in this case.   Sister Michael Marie and Sister Mary Cabrini were disaster relief volunteers for the American Red Cross and the Ross County Emergency Management Agency for an extended period of time, but have not shown that they received compensation, obtained substantial benefits, completed employment-related tax documentation, were restricted in their schedule or activities, or were generally under the control of either organization through any of the other incidents of an agency relationship.   Therefore, their volunteer relationship does not fairly approximate employment and is not covered by Title VII.   Nor, as will be explained, were the Sisters' constitutional rights violated.   Accordingly, the district court's dismissal of the Sisters' claims shall be AFFIRMED.

I

Appellants Sister Michael Marie and Sister Mary Cabrini are traditional Catholic Nuns and part of the Order of the Missionaries of the Sacred Heart.   As such, the Sisters wear habits and crosses and hold some beliefs that are distinct from the Roman Catholic Church.   Sister Marie and Sister Cabrini indicate that, as an expression of their devotion to God and in the practice of their traditional Catholic faith, they have dedicated their lives to assisting the poor and serving the good of the community.   The Sisters have no insurance, and neither has had any personal income for a decade prior to the filing of this suit.   They live together with another adult in a home in Clarksburg, Ohio, where the Order of the Missionaries of the Sacred Heart provides for their needs.

In addition to performing various functions for the Missionaries of the Sacred Heart, the Sisters also serve as volunteers for certain community organizations including the Appellees, First Capital District Chapter of American Red Cross and the Ross County Emergency Management Agency (RCEMA).   The Red Cross is a non-profit corporation chartered by the

United States Congress to perform certain charitable functions including disaster relief. The Red Cross is made up of eight divisions across the United States, which are further subdivided into several regional and then community chapters.

Sister Marie began volunteering with the First Capital District Chapter of the American Red Cross in Chillicothe, Ohio, in 2000. As part of her service with the Red Cross, Sister Marie performed administrative office tasks, assisted with blood services, and was available to respond to disasters should any arise. She did not have a set schedule, but volunteered in the office on a different day each week. Sister Cabrini began volunteering with the same chapter of the Red Cross in 2006. On Saturday evenings of each week, Sister Cabrini served in an on-call capacity should an emergency situation arise.

Upon beginning their service, the Sisters received the Red Cross volunteer handbook. The handbook distinguishes an employee from a volunteer, which is defined as "an individual who, beyond the responsibilities of paid employment, freely assists the Red Cross in the accomplishment of its mission without expectation or receipt of compensation." [Red Cross Resp. Br. at 18-19]. Neither of the Sisters received a regular salary for their work, nor were they the beneficiaries of medical, dental, or vision insurance. The Sisters were not eligible to participate in any retirement plan through the Red Cross and did not receive or complete W-2, W-4, or I-9 forms or pay income taxes as a result of their relationship with the Red Cross. Nevertheless, the Sisters claim that they still received benefits from their participation with the Red Cross. They point to their eligibility for workers' compensation and life insurance, access to training and educational programs, opportunities for networking and improved standing in the community, in-kind travel donations and reimbursements, and access to disaster victims so that they can serve them as part of their religious beliefs.

Supervisors at their chapter of the Red Cross formally evaluated the Sisters' performance. In each of these evaluations the Sisters were designated as volunteers, but received positive reviews. In fact, the Sisters claim that they were viewed so positively that their supervisors recommended them for promotions within the organization. These promotions would not have entitled the Sisters to any salary, but would have altered their roles and responsibilities. However, the Sisters claim that Appellee Mary McCord, the Executive Director of the First

Capital District Chapter of the American Red Cross, refused to allow these promotions. The Sisters indicate that based on personal interactions and representations from other workers in the organization, McCord was biased against them because she is a Roman Catholic and held negative views toward traditional Catholics like the Sisters.

The Sisters initiated an internal investigation into the situation, which they claim resulted in the discovery of a prejudicial email as well as an admission on the part of Red Cross personnel that mistakes had been made and that the Sisters were qualified for a promotion. However, the Sisters were not promoted and, instead, the Red Cross sent them a letter on November 5, 2009 that terminated their working relationship. On November 11, 2009, the Sisters appealed this determination, and on November 20, the Red Cross denied the appeal.

During the same period of time, the Sisters were also volunteers for the Ross County Emergency Management Agency. RCEMA also assists victims during emergencies and disasters. Additionally, the organization supports fire and police departments and coordinates between local, state, and federal emergency management agencies, including the Federal Emergency Management Agency (FEMA). Appellee David Bethel is the Director of RCEMA, which is also overseen by a board of directors that includes, among others, the Executive Director of the First Capital District Chapter of the American Red Cross, Mary McCord.

Sister Cabrini began volunteering with RCEMA in 1994. She indicates that during her time there, she engaged in administrative tasks in the office, including work on maps and manuals. Further, Sister Cabrini assisted in teaching classes on disaster preparedness to a nursing home. Sister Marie began volunteering with RCEMA in 2000. She indicates that she assisted the organization with accounting, mail, periodic drills, and state evaluations. The Sisters also claim to have attended monthly meetings of the Ross County Fire and Rescue Association (RCFRA) on behalf of RCEMA. The RCFRA is a not for profit corporation that reviews emergency plans of agencies within Ross County to avoid conflicts with fire department policies. RCFRA also sponsored a booth at the annual Ross County Fair and the Sisters indicate that they volunteered at that booth on behalf of RCEMA. In carrying out these duties, the Sisters do not appear to have had a set schedule and were not compensated with a regular salary or traditional benefits. The Sisters do indicate that, as a result of their association with RCEMA, they received

the opportunity for grants, access to several trainings, workers' compensation insurance, funeral insurance coverage, and liability insurance coverage in the event that they were harmed while they were participating in disaster relief services on RCEMA's behalf.

On September 2, 2009, David Bethel sent a letter to all RCEMA volunteers to inform them that they would no longer be volunteering at special events for RCFRA. Bethel sent another letter to all RCEMA volunteers on September 8, indicating that the organization was updating its records and wanted to gauge their interest in remaining volunteers. He also requested permission to conduct police background checks on each volunteer. At the time Bethel sent this letter, RCEMA had sixteen volunteers. After Bethel removed those who failed to respond to the letter, did not wish to remain a volunteer, or did not consent to a police background check, only five volunteers remained, including Sister Cabrini and Sister Marie. The Sisters responded by return letter on September 23, 2009. In that letter, they expressed disappointment in the management of the organization and that their skills had not been better used under Bethel's direction. However, they also expressed their interest in continuing to volunteer with RCEMA and consented to a police background check. On October 5, 2009, Bethel responded to the Sisters that, "[i]t is apparent that you are dissatisfied with the operation of our office. I feel it is in the best interest of the County Emergency Management Agency to terminate your volunteer status with our office." [Corrected Appellant Br. at 137]. The Sisters then composed a letter to the Ross County Board of Commissioners once again stating their interest in remaining volunteers of RCEMA and seeking to resolve what they characterized as a misunderstanding of their intent. The Board of Commissioners did not respond.

On November 5, 2009, the Sisters filed a discrimination charge against RCEMA and the Red Cross with the Ohio Civil Rights Commission and the Equal Employment Opportunity Commission. OCRC dismissed the Sisters' charges on May 13, 2010, finding that it had no jurisdiction because the Sisters were not employed by RCEMA or the Red Cross. OCRC also denied reconsideration of that determination, though it did note that the Sisters had fifteen days to seek review of the decision through the EEOC. The record does not provide any indication that the Sisters availed themselves of this review. On December 20, 2010, the Sisters did request

a right-to-sue letter from the EEOC, but the EEOC informed them that it does not provide a Notice of Right to Sue Letter in a jurisdictional dismissal by the OCRC.[1]

The Sisters initiated the instant action on June 1, 2011. They asserted claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000e *et seq.*, and the Ohio Civil Rights Act for religious discrimination, retaliation, and harassment. The Sisters also brought claims under 42 U.S.C. § 1983 for violations of their constitutional rights of, among other things, free speech, free exercise of religion, and equal protection under the law. Finding that the Sisters had not sufficiently alleged that the American Red Cross and Mary McCord were state actors, the district court dismissed the § 1983 claims against them. In the same order the court also dismissed any possible *Bivens* claims that the Sisters might have asserted because the Amended Complaint did not give notice of such claims. Finally, the district court granted the Appellees' subsequent motion for summary judgment, finding that there was no dispute of material fact that Bethel or RCEMA violated the Sisters' constitutional rights and that, because they were not employees of either RCEMA or the Red Cross, the Sisters could not maintain a claim against them under Title VII. The Sisters now appeal these decisions to this court.

II

A

Sister Marie and Sister Cabrini argue that the district court's order granting summary judgment should be reversed because it is based on an erroneous conclusion that they were not employees of the Red Cross or RCEMA. This court reviews a lower court's grant of summary judgment *de novo*. *Bultema v. United States*, 359 F.3d 379, 382 (6th Cir. 2004). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The burden is initially on the moving party to inform "the district court of the basis of its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of a material fact." *Celotex Corp. v.*

---

[1] The district court did not reach the issue of whether the Sisters' failure to obtain a right to sue letter bars their claims, and the parties do not discuss it on appeal.

*Catrett*, 477 U.S. 317, 323 (1986).  The moving party may make this showing by demonstrating the absence of evidence to support one of the essential elements of the nonmoving party's claim. *Id*. at 322-25.  Once this burden is met, the nonmoving party bears the "burden of producing in turn evidence which would support a jury verdict."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  In the absence of a genuine issue of material fact, it is appropriate for the court to determine employment status as a matter of law.  *Bryson v. Middlefield Volunteer Fire Dep't, Inc.*, 656 F.3d 348, 352 (6th Cir. 2011) (citing *Simpson v. Ernst & Young*, 100 F.3d 436, 439 (6th Cir. 1996)).

Title VII of the Civil Rights Act of 1964 prohibits, among other things, religious discrimination against individuals in the context of the employment relationship.  Pursuant to Title VII, it is impermissible "for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1) (2012).  An employer is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. § 2000e(b) (2012).

The parties agree that the critical issue is whether the Sisters were "employees" of the Red Cross or RCEMA.  For purposes of Title VII, an employee is "an individual employed by an employer."  42 U.S.C. § 2000e(f) (2012).  The circularity of this definition renders it quite unhelpful in explaining whom Congress intended to include as an employee in the workplace. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992) (noting that the same definition of "employee" in the ERISA statute is "completely circular and explains nothing").  Therefore, we assume "that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine." *Id*. at 322-23.  Toward that end, the Supreme Court has stated:

> In determining whether a hired party is an employee under the general common law of agency, we consider [1] the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are [2] the skill required; [3] the source of the instrumentalities and tools; [4] the location of the work; [5] the duration of the relationship between the

parties; [6] whether the hiring party has the right to assign additional projects to the hired party; [7] the extent of the hired party's discretion over when and how long to work; [8] the method of payment; [9] the hired party's role in hiring and paying assistants; [10] whether the work is part of the regular business of the hiring party; [11] whether the hiring party is in business; [12] the provision of employee benefits; [13] and the tax treatment of the hired party.

*Id.* at 323-24 (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52) (citing Restatement (Second) of Agency § 220(2) (1958); Rev. Rul. 87-41, 1987-1 C.B. 296, 298-99).

In *Bryson v. Middlefield Volunteer Fire Dep't, Inc.*, we determined that volunteers potentially may be employees for the purposes of Title VII. 656 F.3d 348, 353 (6th Cir. 2011). Further, we concluded that the so-called *Darden* factors from the common law agency test are the appropriate means of measuring whether a volunteer merits the protections of employment discrimination laws. *Id.* at 354. Admittedly, this test is not neatly applied to the volunteer context. The original purpose of the factors of the common law agency test adopted in *Darden* was for use "[i]n determining whether one acting for another is a servant [employee] or an independent contractor." Restatement (Second) of Agency § 220(2) (1958). However, because volunteers do not usually receive compensation in the traditional sense, they are quite differently situated than either employees or independent contractors, between which the common law agency test is designed to differentiate. *See O'Connor v. Davis*, 126 F.3d 112, 115-16 (2d Cir. 1997) (quoting *Graves v. Women's Prof'l Rodeo Assoc., Inc.*, 907 F.2d 71, 73-74 (8th Cir. 1990)) (noting that the common law agency test is designed for use "'only in situations that plausibly approximate an employment relationship,'" and "[w]here no financial benefit is obtained by the purported employee from the employer, no 'plausible' employment relationship of any sort can be said to exist because . . . 'compensation . . . is an essential condition to the existence of an employer-employee relationship'").

Because of these differences, all of the other circuits to have considered the circumstances under which a volunteer is an employee have exalted remuneration as an independent antecedent inquiry, such that the traditional common law agency analysis is only employed when the volunteer relationship fairly approximates an employment relationship.[2] In

---

[2] *Juino v. Livingston Parish Fire Dist. No. 5*, 717 F.3d 431, 435 (5th Cir. 2013) (noting that the Second, Fourth, Eighth, Tenth, and Eleventh Circuits have adopted the threshold-remuneration test); *Waisgerber v. City of*

*Bryson*, we expressly rejected this threshold remuneration test in favor of full application of the common law agency test, requiring that "'all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" 656 F.3d at 354 (quoting *Darden*, 503 U.S. at 324). Thus, in this circuit, remuneration is not an independent antecedent requirement, but rather it is a nondispositive factor that should be assessed in conjunction with the other *Darden* factors to determine if a volunteer is an employee. However, as the *Bryson* panel remanded the action to the district court for further consideration, it did not provide further guidance to courts as to how to apply the factors in light of their incongruity with the volunteer context.

In this case, the district court, as instructed by *Bryson*, weighed all of the common law agency factors, including remuneration, and determined that the Sisters were not employees of the Red Cross or RCEMA. Though the Red Cross is somewhat critical of this test in the briefs, the main dispute between the parties on appeal is not whether the district court applied the proper test, but whether it weighed all of the factors of that test correctly. The Sisters argue that the district court erred by treating every factor of the analysis as equal rather than varying the "degree of importance" of each factor depending on the occupation and factual context in which the Sisters performed their services. [Appellant Reply Br. at 10-11]. In their view, the fact that they were volunteers means that factors related to remuneration, such as compensation and tax treatment, are not important in the common law analysis because one would not expect a volunteer to satisfy these factors whether or not she is an employee.

However, in making these arguments, the Sisters ask this court to engage in the same type of behavior that *Bryson* repudiated. As discussed, other circuits have structurally modified the common law agency test for the volunteer context. While other circuits have altered the test in such a way as to make remuneration categorically more important, the Sisters seek modification of the opposite sort, such that remuneration would be categorically weighted less when a volunteer is being considered. *Bryson* rejected these types of modifications and established a principle that would seem to cut both ways. If *Darden* factors are to be applied,

---

*Los Angeles*, 406 F. App'x 150, 152 (9th Cir. 2010); *York v. Assoc. of Bar of City of N.Y.*, 286 F.3d 122, 126 (2d Cir. 2002); *McGuinness v. Univ. of N.M. Sch. of Med.*, 170 F.3d 974, 979 (10th Cir. 1998); *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1243-44 (11th Cir. 1998) ("[O]nly individuals who receive compensation from an employer can be deemed "employees" under the statute."); *O'Connor*, 126 F.3d at 115-16 (2d Cir. 1997); *Haavistola v. Cmty. Fire Co. of Rising Sun, Inc.*, 6 F.3d 211 (4th Cir. 1993); *Graves*, 907 F.2d at 71 ("Compensation by the putative employer to the putative employee in exchange for his services is not a sufficient condition, but it is an essential condition to the existence of an employer-employee relationship.").

remuneration should not be exalted to a threshold factor nor should it be categorically discarded simply because an individual is a volunteer.  On the contrary, *Bryson* expressly acknowledges that even in the volunteer context "remuneration is a factor to be considered" and that "several of the factors listed in *Darden* and *Reid* relate to financial matters." *Bryson*, 656 F.3d at 354-55 (citing *Ware v. United States*, 67 F.3d 574, 577-78 (6th Cir. 1995)).

It is true that *Bryson* states that "[t]he degree of importance of each factor [will vary] depending on the occupation and the factual context in which the services are performed." *Id*. at 354 (citations omitted).  However, when viewed in context, *Bryson*'s admonition has less to do with the fact that the Sisters were volunteers than what they were doing as volunteers and the law under which they brought their claim.  *See Ware*, 67 F.3d at 578 (contrasting the application of the *Darden* factors as applied under the Copyright Act and ERISA and stating that "it seems clear that the relative weight given each factor may differ depending upon the legal context of the determination").  That is to say, some factors that are less helpful in determining whether a disaster relief worker is an employee under Title VII might be more helpful in making the same determination when a different type of work or statute is at issue.

The factors most closely related to remuneration and financial matters—the method of payment, the provision of employee benefits, and tax treatment—are particularly relevant here.  Thus, in considering the application of the common law agency test to the facts of this case, we first consider these financial factors.

1

Concerning method of payment, it is undisputed that the Red Cross and RCEMA did not, at least in the traditional sense, pay the Sisters at all.  In this fact the first sign of the incongruity between the common law agency test and the volunteer context is apparent.  That the Sisters received no payment moves the court no closer to a choice between employees or independent contractors, who both receive payment in some form for their labor.  However, whether the Sisters are independent contractors or not is largely an academic point.  The real object of applying the *Darden* factors is to determine "whether a hired party is an *employee* under the general common law of agency." *Darden*, 503 U.S. at 323 (emphasis added) (quoting *Reid*, 490 U.S. at 751).  Regardless of how volunteers or independent contractors are usually paid,

employees generally receive a regular salary.  *See Janette v. Am. Fid. Grp., Ltd.*, 298 F. App'x 467, 475 (6th Cir. 2008) (citing *Weary v. Cochran*, 377 F.3d 522, 527 (6th Cir. 2004)).  That the Sisters did not receive remuneration in this manner weighs against a finding that they are employees of the Red Cross or RCEMA.

2

The Red Cross and RCEMA not only did not provide a regular salary to the Sisters, but they also did not provide them with traditional benefits such as medical, vision, or dental insurance.  As these types of benefits are often present in the employment relationship, their absence also weighs against a finding that the Sisters were employees.  Nevertheless, due in part to the complexities of the modern economy, some courts have found a jury question as to the issue of remuneration and benefits even in the absence of traditional benefits.  For example, in *Bryson*, the court determined that this factor could suggest that volunteer firemen were employees when they received workers' compensation insurance coverage, training, gift cards, personal use of the fire department facilities and assets, access to emergency funds, certain retirement payments, and even, under some circumstances, an hourly wage.  656 F.3d at 355; *see also Pietras v. Bd. of Fire Comm'rs*, 180 F.3d 468, 473 (2d Cir. 1999) (finding that a jury could conclude that a fireman obtained significant remuneration when he received, among other things, a retirement pension, life insurance, and some medical benefits); *Haavistola*, 6 F.3d at 221-22 (finding that a jury could conclude that firemen obtained significant remuneration when they received, among other things, group life insurance, tuition reimbursement for courses in emergency medical and fire service techniques, tax-exemptions, reduced rates on commemorative license plates, and an opportunity to obtain paramedic certification).  The job-related benefits that these firemen received bear a resemblance to traditional forms of compensation for employees because they include presently vested benefits with real financial value given as consideration for an ongoing relationship and continued service.  *See York v. Assoc. of Bar of City of N.Y.*, 286 F.3d 122, 126 (2d Cir. 2002).  As a result, these benefits are not only real and tangible, but also do not resemble lump-sum or incidental payments that independent contractors might receive for their work.  *Id.*

Some courts have gone further, recognizing that even non-financial benefits can cause the remuneration factors to weigh in favor of the employment status in some situations. In *Rafi v. Thompson*, the court found that some volunteers might be able to show a direct connection between their volunteer service and access to specific job opportunities such that "a clear pathway to employment . . . might constitute sufficient compensation to bring . . . volunteers under Title VII." No. 02-2356, 2006 WL 3091483, at *1 (D.D.C. Oct. 30, 2006). On the other hand, arguments about enhanced career opportunities, access to training, or possible future employment have been rejected by courts when these opportunities are accessible to the public generally or when they are too speculative. *See Graves*, 907 F.2d at 73 (noting that the career advancement opportunities could not be considered remuneration in part because they were generally available even to non-members); *Moran v. Harris Cnty.*, No. H-07-582, 2007 WL 2534824, at *1 (S.D. Tex. Aug. 31, 2007) (finding that free certification classes, networking opportunities, and job experience benefits were too speculative to count as remuneration); *Holder v. Town of Bristol*, No. 3:09-CV-32PPS, 2009 WL 3004552, at *6 (N.D. Ind. Sept. 17, 2009) (concluding that the prospects of future employment were too speculative to be considered as remuneration). The difference between the two situations may relate to control. In situations where there is a sufficiently probable and clear path to employment from volunteer to paid position, the volunteer is economically dependent on the employer in a manner not found in more speculative contexts.

Even construing the evidence in the light most favorable to the Sisters, the job-based benefits they claim to have derived from volunteering with the Red Cross and RCEMA are very much unlike those traditionally received by employees or found to constitute remuneration in the aforementioned cases. Many of the benefits, such as workers' compensation insurance eligibility, liability insurance for injuries sustained during service, in-kind donations, and reimbursements for travel on organization business, are contingent or were simply incidental to their work with the organization rather than valuable financial consideration exchanged in return for services.[3] Additionally, the educational opportunities, possibility for promotions, increased

---

[3]The benefit that most closely resembles the type of valuable remuneration received by employees is the eligibility for life insurance that the Sisters claim to have had through the Red Cross. However, the life insurance eligibility was actually through the association of the Red Cross with the Ross County Fire and Rescue Association. [R. 129 at 22]. Even from this record it appears that one may become associated with RCFRA in other ways aside

standing in the community, networking opportunities, opportunities for grants, and access to opportunities to serve are speculative and insufficient to constitute remuneration here. The record also reflects that the educational opportunities and the ability to assist victims of disasters were generally available to the Sisters, who would not have needed to be a part of either organization to participate. Further, though the Sisters sought promotions in the organizations, they were not seeking to achieve a paid position as a result of their education or promotion. In short, the Red Cross and RCEMA did not provide the Sisters with the type of benefits usually provided to employees. Consequently, this factor weighs against the Sisters.

3

Additionally, as it relates to financial matters, it is noteworthy that none of the parties treated the Sisters as employees for income tax purposes. The Sisters did not receive or complete W-2, W-4, or I-9 forms or pay income taxes as a result of their relationship with the Red Cross or RCEMA. As a result, this factor, like the others related to remuneration and financial matters, also weighs against a finding that they are employees.

4

The right to control of the means and manner of performance, the right to assign additional projects, and the discretion over when and how long to work are *Darden* factors that, under these circumstances, are related to one another and bear very strongly on the issue of control. "The crux of *Darden*'s common law agency test is 'the hiring party's right to control the manner and means by which the product is accomplished.'" *Weary*, 377 F.3d at 525 (quoting *Darden*, 503 U.S. at 323). That is not to say that this factor is dispositive, as "'all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" *Bryson*, 656 F.3d at 354 (quoting *Darden*, 503 U.S. at 324); *see also Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 450-51 (2003). However, "this Court has repeatedly held that the 'employer's ability to control job performance and the employment opportunities of the aggrieved individual' are the most important of the many factors to be considered." *Janette*, 298 F. App'x at 472 (citing *Simpson*, 100 F.3d at 442); *Trs. of Resilient*

from volunteering with the Red Cross. For example, the Sisters indicated that they were also associated with the RCFRA through RCEMA. [Corrected Appellant Br. at 25]. At any rate, the receipt of life insurance eligibility alone would not be enough to cause this factor to weigh in favor of finding the Sisters to be Red Cross employees.

*Floor Decorators Ins. Fund v. A & M Installations, Inc.*, 395 F.3d 244, 249 (6th Cir. 2005); *Johnson v. City of Saline*, 151 F.3d 564, 568 (6th Cir. 1998). Indeed, the idea of control is "embodied in many of the specific factors," the analysis of which "reflects upon, and is relevant to, this core issue of control." *Weary*, 377 F.3d at 525.

The Sisters argue that RCEMA and the Red Cross exercised control over the means and manner of their performance because they provided them with a set schedule and had the power to assign their volunteer tasks. However, this assertion is largely unsupported by the facts of the record. There is no evidence that RCEMA ever required the Sisters to operate on a fixed schedule or closely controlled their work when they volunteered. While there is evidence that, on occasion, the Red Cross provided the Sisters with a set schedule of volunteer times, the Sisters expressly note that these times were at least somewhat based on their personal availability. Sister Marie noted that she volunteered regularly for the Red Cross, "when [she] was available." [R. 78 at 52-53]. Sister Cabrini was on call from her home to respond to disasters every Saturday and only reported in "if [she was] not available." [R. 76 at 18].

In *Janette*, a plaintiff argued to this court that she should be considered an employee because the employer set her schedule, required her to perform certain assignments, and could assign additional tasks for her to complete. 298 F. App'x at 473, 475. This court held that these facts were not dispositive because, although the plaintiff had shown that her employer had input into these areas, she retained significant discretion over her own time and work. Further, the court found that the plaintiff had failed to produce any evidence that the schedule and assignments of her employer were any more than requests that she had the right to refuse and negotiate. *Id.* at 475. The same is true here. The only evidence showing that the Red Cross directed any of the Sisters' activities also reveals that the Sisters retained considerable discretion and flexibility in when and how they volunteered. These facts show that either the schedule and duties were crafted to accommodate the Sisters' availability or the Sisters could simply refuse times or tasks assigned to them. This would, after all, be expected as the Sisters are volunteers working relatively infrequently, in rotating or on-call capacities, and on tasks that are easily transferrable among volunteers. There is a much different degree of control when an individual must work at a time definitively set by an employer for its own benefit than when the individual

has the flexibility to craft her schedule as it suits her. In this way, the Sisters bear little similarity to employees.

The Sisters argue that if they had not worked when assigned, accepted the projects given to them, or carried out their duties in the manner directed by RCEMA and the Red Cross, they would have been terminated. In their view, this demonstrates that RCEMA and the Red Cross did exercise a measure of control over them that is like that of an employer. As an initial matter, this does not appear to be altogether accurate from the record. According to Sister Marie's deposition, she had not reported to the Red Cross office for over a year before she was terminated. Nevertheless, she continued to consider herself a volunteer for the Red Cross. The Red Cross evidently shared this belief or it would not have seen the need to terminate its volunteer relationship with her. Thus, the Sisters' representations that their volunteer status depended on their adherence to the directions of the Red Cross and RCEMA as to when and how to work are unsubstantiated.

This argument also reveals another important and pronounced difference between volunteers like the Sisters and employees. An employer's ability to terminate a non-compliant employee, which is perhaps an employer's greatest source of control, is meaningful because the employee stands to lose not only her job, but also the source of income upon which she depends. This notion that control is related to compensation was at the heart of the economic realities test previously employed by this circuit to determine employment status. The economic realities test looked "to whether the putative employee is *economically dependent* upon the principal or is instead in business for himself." *Lilley v. BTM Corp.*, 958 F.2d 746, 750 (6th Cir. 1992) (emphasis added) (citations omitted); *see also Shah v. Deaconess Hosp.*, 355 F.3d 496, 499 (6th Cir. 2004).

Though we make no attempt to resurrect the economic realities test from the grave, its central teaching remains instructive to the application to the *Darden* factors. Indeed, we have previously recognized that there is at best "no material difference," *Simpson*, 100 F.3d at 442, and at worst, "minimal" substantive differences between the economic realities test and the common law agency test. *Shah*, 355 F.3d at 499 (citations omitted). In *Bryson*, we tacitly acknowledged this fact when we noted that "several of the factors listed in *Darden* and *Reid*

relate to financial matters." 656 F.3d at 354 (citing *Ware*, 67 F.3d at 577-78). The economic reality is that when volunteers work without traditional forms of remuneration like salary and benefits, employers are generally without leverage to control that volunteer's performance. And control is "[t]he crux of *Darden's* common law agency test." *Weary*, 377 F.3d at 525 (quoting *Darden*, 503 U.S. at 323).

Even if RCEMA and the Red Cross would have threatened to sever their volunteer relationship with the Sisters upon their refusal to adhere to a set schedule or to accept the tasks given them, this does not necessarily show that the agencies exercised any real control over the Sisters. Unlike most employees, the Sisters are not economically reliant on RCEMA or the Red Cross in any real or measurable way. Since economic dependence is one of the primary sources of employer control over employees, this fact significantly undercuts the Sisters' argument that they were under the control of either agency.

The record does not reflect that RCEMA or the Red Cross possessed the right to assign additional projects, to decide when and how long the Sisters worked, or to control the means and manner in which they worked. As a result, these three important factors weigh heavily against a finding that the Sisters were employees.

5

The Sisters have been associated with the Red Cross and RCEMA for several years and argue that the duration of their relationship weighs in favor of finding them to be employees. However, in evaluating this factor the court "is not concerned with the length of the relationship, but rather, when hired, whether the relationship was one of a long-term at-will employee or one to complete a particular task in a specified time-frame." *Janette*, 298 F. App'x at 474 (citations omitted). The Sisters primarily represent their involvement with the Red Cross and RCEMA as being in the form of disaster relief, trainings, and participation in local events like the county fair. These jobs are more akin to particular tasks for which RCEMA and the Red Cross contracted with the Sisters rather than the consistent duties of a long-term employee. Though the defendants contest it, the Sisters do note that they were also involved on a more consistent basis by volunteering to assist with office and administrative work. However, the record reflects that

these duties were infrequently done and are not enough to shift this factor toward a finding that the Sisters were employees.

6

On the other hand, one factor discussed by the parties does clearly weigh in favor of finding that the Sisters are employees of the Red Cross and RCEMA. According to the description of their duties, the Sisters were primarily volunteering with the organizations in the area of disaster relief, which was the regular business of the Red Cross and RCEMA. Though RCEMA notes that there is no evidence that the Sisters ever engaged in disaster relief operations on its behalf, the activities that the Sisters did engage in on RCEMA's behalf, including volunteering at the local fair, did at least relate to the organization's disaster relief operations. Because disaster relief is part of the regular business of the Red Cross and RCEMA, this factor weighs in favor of a finding that the Sisters are employees.

7

The remainder of the *Darden* factors—the skill required, location of the work, source of instrumentalities and tools, the Sisters' role in hiring and paying assistants, and whether or not the Red Cross and RCEMA are in business—receive little discussion from the parties and are not particularly instructive on these facts. It is sufficient for the purposes of this case to note that the Sisters have not shown that any combination of these factors overcomes the substantial weight of the previously discussed *Darden* factors that militate decisively against a finding that they are employees of the Red Cross or RCEMA. Since Sister Marie and Sister Cabrini cannot show themselves to be employees under the common law agency test, the district court properly granted summary judgment as to their claims under Title VII.

B

The conclusion under Title VII is also fatal to the Sisters' state law claims under the Ohio Civil Rights Act. As the district court correctly noted, Ohio state courts "have determined that federal case law interpreting Title VII of the Civil Rights Act of 1964, § 2000e *et seq.*, Title 42, U.S. Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Hampel v. Food Ingredients Specialties, Inc.*, 729 N.E.2d 726, 731 (Ohio 2000) (quoting

*Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civ. Rights Comm.*, 421 N.E.2d 128, 131 (Ohio 1981)). The Sisters make no compelling argument that a determination that they are not employees under Title VII does not require the same result under OCRA. As a result, summary judgment was likewise appropriate for the Sisters' state law claims.

C

The Sisters also argue that the district court committed error by granting RCEMA's motion for summary judgment as to their claims asserted against RCEMA and David Bethel under 42 U.S.C. § 1983. Specifically, the Sisters allege violations of their First Amendment rights to free speech and free exercise of religion, as well as their Fourteenth Amendment rights of equal protection.[4]

Concerning their First Amendment claims,[5] the Sisters believe that Bethel terminated their volunteer relationship in retaliation for expressing their traditional Catholic beliefs through volunteering out of devotion to God and by wearing traditional habits, rosaries, and crosses. Because they see this as expressive conduct and part of their sincerely held religious beliefs, the Sisters argue that termination on these grounds is impermissible.

To establish a claim for First Amendment retaliation, the Sisters must allege that: (1) they engaged in constitutionally protected conduct; (2) RCEMA and Bethel took an adverse action against them that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by their protected conduct. *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012) (citing *Mezibov v. Allen*, 411 F.3d 712, 717 (6th Cir. 2005)). The district court decision and the subsequent discussion of the parties in the briefing focuses largely on the third factor of this analysis. To show a causal connection under this factor, the Sisters must first establish that the protected conduct was a

---

[4] The district court also dismissed the Sisters' constitutional claims based on their rights of free association and due process. However, the Sisters do not argue this determination on appeal and have apparently abandoned those claims.

[5] Though the Sisters brought claims for violations of both their rights of free speech and free exercise of religion, this court has previously found that "[b]ecause the analytic tools for adjudicating First Amendment retaliation claims under the Free Speech Clause have been so extensively developed, courts in this and other circuits have tended to import fully that reasoning when litigants have characterized their claims as arising under another First Amendment clause." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006) (citing *Thaddeus-X*, 175 F.3d at 390). Further, the Sisters have identified the same protected conduct and adverse actions as supporting their claims under both First Amendment clauses. Accordingly, the claims are analyzed together.

motivating factor behind their termination. *Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999) (en banc) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)). However, RCEMA would still prevail on summary judgment by showing that it would have taken the same action anyway. *Id.* The district court found that the Sisters produced no evidence that RCEMA terminated them because of their expressive conduct or their sincerely held religious beliefs, and, as a result, they failed to carry their initial burden under the third factor.

The Sisters disagree with this conclusion. They claim that, through their discussions with him and through newspaper reports, Bethel knew they were traditional Catholic nuns. Further, the Sisters note that while Bethel was originally friendly to them, he later began to avoid them, exhibited increasingly more hostile behavior toward them, and excluded them from drills for no reason. There are, however, several problems with these arguments. As an initial matter, that Bethel knew of their religion and that he avoided and treated them in a hostile manner after a period of time does not necessarily show that the former is the reason for the latter. This is especially true in light of the fact that the Sisters admit that Bethel came to know of the Sisters' religious beliefs at the beginning of his term of director of RCEMA, about six years before their eventual termination. If Bethel knew of the Sisters' religious convictions and their expressions of these beliefs at the beginning of his tenure, when he was by their own admission still friendly to the Sisters, religious animus would not explain why he began avoiding them or treating them in an increasingly hostile manner. Further, the Sisters never elaborate on what exactly Bethel did that they considered hostile or what evidence led them to believe that such hostile behavior was somehow connected to their expressive conduct or their religious beliefs. As the Sisters have not satisfied their burden on an essential element of their First Amendment retaliation claims, the district court's dismissal of those claims was warranted.

The Sisters also contend that RCEMA violated their Fourteenth Amendment right to equal protection under the law when RCEMA terminated their volunteer relationship. The Equal Protection Clause of the Fourteenth Amendment prohibits a state from denying to "any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. "The Clause embodies the principle that all persons similarly situated should be treated alike."

*Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). Disparate treatment is a threshold element, which the Sisters must show in order to maintain their claim under the Equal Protection Clause. *Id.* Finding that the Sisters had provided no evidence that they were treated differently from any other RCEMA volunteer, the district court granted RCEMA's motion for summary judgment on this point.

The Sisters argue on appeal that the record does, in fact, show that RCEMA treated them differently than the other RCEMA volunteers because of their religious beliefs. In support of this claim the Sisters primarily challenge Bethel's credibility and his reason for terminating them—that they sent him a letter disapproving of the management of the organization. The trouble with these arguments, however, is that they overlook the fact that disparate treatment is a threshold element that the Sisters must cross in order to trigger an equal protection analysis of the classifications made by RCEMA and its justifications for doing so. *Scarbrough*, 470 F.3d at 260. This record is devoid of information that Bethel treated the Sisters differently than the other volunteers. The Sisters were terminated from their volunteer positions, but it appears that this occurred during a routine update of the RCEMA volunteer database. Bethel sent letters to all sixteen volunteers who had previously worked with RCEMA to determine whether they would continue to serve as volunteers for the organization. Bethel ultimately discontinued RCEMA's volunteer relationship with the vast majority of these volunteers. It may be that the Sisters are the only two who were terminated despite expressing their interest in continuing to volunteer, but they were also the only two who wrote back to express their dissatisfaction with the management of the agency and the use of their abilities in its operation. This alone is not sufficient to show that Bethel singled out and treated the Sisters differently than other similarly situated volunteers because of their religious beliefs. Without evidence of disparate treatment, the Sisters cannot maintain a § 1983 claim for equal protection violations, and the district court's decision was correct.

D

The district court also properly dismissed the Sisters' constitutional claims against the Red Cross and Mary McCord on the grounds that they were not state actors as required by

42 U.S.C. § 1983.  This court reviews *de novo* a district court's dismissal under Federal Rule of Civil Procedure 12(b)(6).  To survive a motion to dismiss under Rule 12(b)(6), the Sisters' complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In the context of § 1983, the Sisters argue that the Red Cross or Mary McCord acted under color of state law to deprive them of a right secured by the Constitution or by laws of the United States.  42 U.S.C. § 1983 (2012); *see also Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003).  The Red Cross and Mary McCord are considered state actors for the purposes of § 1983 only if their conduct that allegedly gave rise to the deprivation of the Sisters' constitutional rights may be "fairly attributable to the State."  *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982).  This circuit has recognized as many as four tests to aid courts in determining whether challenged conduct is fairly attributable to the State:  (1) the public function test; (2) the state compulsion test; (3) the symbiotic relationship or nexus test; and (4) the entwinement test.  *Vistein v. Am. Registry of Radiologic Technologists*, 342 F. App'x 113, 127 (6th Cir. 2009) (citing *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992); *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 298 (2001)).[6]

To show that the Red Cross and Mary McCord were state actors under the public functions test, the Sisters must show that "they exercise powers which are traditionally exclusively reserved to the state, such as holding elections or eminent domain." *Wilcher v. City of Akron*, 498 F.3d 516, 519 (6th Cir. 2007) (quoting *Wolotsky*, 960 F.2d at 1335).  The Sisters allege that the Red Cross is an organization that responds to disasters and that disaster response is in the historical and traditional province of the state.  They attempt to evince this by citing various portions of a Red Cross publication, which notes that the Red Cross was chartered by the United States Congress and given a mandate from the government to, among other things, assist state governments in responding to disasters in ways that exceed other charitable organizations.

---

[6]Some cases in this circuit have only enumerated three tests for evaluating whether an action is fairly attributable to the state.  *See, e.g.*, *Wilcher v. City of Akron*, 498 F.3d 516, 519 (6th Cir. 2007).  However, as the most recent decision from this circuit includes a separate discussion of the entwinement test, and the Sisters argue that the Red Cross is a state actor under that separate test, we discuss the entwinement test separately as well.  *See Vistein*, 342 F. App'x at 128.

As an initial matter, simply alleging in a complaint that the Red Cross is a state actor or that disaster relief is traditionally exclusively in the province of the State is no longer, if it ever was, sufficient to survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556) (noting that courts "are not bound to accept as true a legal conclusion couched as a factual allegation"); *see also Tahfs*, 316 F.3d at 593. Instead, the burden is on the Sisters to advance historical and factual allegations in their complaint giving rise a reasonable inference that disaster relief is traditionally exclusively in the province of the State. *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003) ("When considering whether private action should be attributed to the state under the public function test, the court conducts a historical analysis to determine whether the party has engaged in an action traditionally reserved to the state, and the plaintiff bears the burden of making that showing."). Under this "relatively stiff test," few areas are deemed exclusive state action (e.g. elections, eminent domain), and many other actions—even those that involve extensive government regulation—do not suffice to establish state action (e.g. insurance, education, workers' compensation, or electrical utilities). *Wilcher*, 498 F.3d at 519; *see Flagg Bros. v. Brooks,* 436 U.S. 149, 157-62 (1978); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 353 (1974); *Lansing v. City of Memphis*, 202 F.3d 821, 832 (6th Cir. 2000). The Sisters' Amended Complaint, as elaborated upon by their brief, has alleged facts that show that the Red Cross was chartered by the federal government and that it works with state governments that also engage in disaster relief activities. However, this is very different from alleging facts tending to show that disaster relief operations are traditionally within the exclusive province of the State. The Sisters fail to provide any historical argument or analysis that disaster relief is traditionally exclusively a state function. "Considering that plaintiff bears the burden on this issue, this failure alone renders this test inapplicable." *Tahfs*, 316 F.3d at 593.[7]

The Sisters do not argue that the State compelled the Red Cross or McCord to take action against them, but they do believe that they are state actors under the symbiotic relationship test. Under this test, also known as the nexus test, a private party's conduct constitutes state action where "there is a sufficiently close nexus between the state and the challenged action of the

---

[7]It is notable that the court in *Tahfs* was also considering the grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b) when discussing what is required of plaintiffs under the public functions test.

regulated entity so that the action of the latter may be fairly treated as that of the state itself." *Wilcher*, 498 F.3d at 520 (citation omitted). In support of this test, the Sisters argue that they have sufficiently shown a symbiotic relationship by pleading that the Red Cross is financially dependent on government assistance and that they regularly partner with state and local governments in disaster relief. However, the fact that the Red Cross receives public funding is not sufficient to establish a close nexus between state and private actors. *Lansing*, 202 F.3d at 830 (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982)). Indeed, the Supreme Court held that a private school's personnel decisions were not fairly attributable to the State even though "virtually all of the school's income was derived from government funding." *Rendell-Baker*, 457 U.S. at 840. Further, "mere cooperation simply does not rise to the level of merger required for a finding of state action." *Lansing*, 202 F.3d at 831.

Additionally, it is important to note that this test evaluates whether "there is a sufficiently close nexus between the state and *the challenged action*." *Wilcher*, 498 F.3d at 520 (emphasis added) (citation omitted); *see also Rendell-Baker*, 457 U.S. at 841; *Blum v. Yaretsky*, 457 U.S. 991, 1005-12 (1982). Here, the challenged actions are the failure of the Red Cross to promote the Sisters and the ultimate decision to terminate them. There are no allegations in the Amended Complaint to show that the State had any connection to these types of personnel decisions within the Red Cross. Thus, the Sisters have not shown any nexus between the challenged action and the State under this test.

Finally, the Sisters argue that the conduct of the Red Cross and McCord is state action under the entwinement test. To satisfy the requirements of this test the Sisters must show that the Red Cross is "entwined with governmental policies" or that the government is "entwined in [the private entity's] management or control." *Vistein*, 342 F. App'x at 128 (quoting *Brentwood*, 531 U.S. at 296). The Sisters claim that during disasters the Red Cross works so closely with state agencies that it is difficult to delineate between them. Undoubtedly, in disaster situations all responders must work together in order to effectively aid victims and avoid danger. However, once again, "mere cooperation simply does not rise to the level of merger required for a finding of state action." *Lansing*, 202 F.3d at 831. Further, "[t]he crucial inquiry under the entwinement test is whether the 'nominally private character' of the private entity 'is overborne

by the pervasive entwinement of public institutions and public officials in its composition and workings [such that] there is no substantial reason to claim unfairness in applying constitutional standards to it.'" *Vistein*, 342 F. App'x at 128 (quoting *Brentwood*, 531 U.S. at 294). The Sisters' allegations do not meet this threshold, and so the actions of the Red Cross are not fairly attributable to the State under the entwinement test either. Therefore, because the Sisters have failed to allege sufficient facts to show that the Red Cross and Mary McCord acted under the color of state law, the district court properly dismissed the § 1983 claims against them.

E

The district court's order dismissing the § 1983 claims against the Red Cross also contains a footnote essentially dismissing—to the extent they were ever asserted—the Sisters' *Bivens* claims against the Appellants because the Amended Complaint had not sufficiently placed them on notice of such claims. This decision was prompted by a footnote in the Sisters' response brief that characterized their complaint as bringing direct constitutional violation claims. On appeal, the Sisters further clarified that they intended to and did assert *Bivens* claims against David Bethel and Mary McCord, and that the district court erred by dismissing those claims.

For a claim to be viable, the complaint must, at a minimum, "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, the Supreme Court created a private right of action for damages against federal officers who are alleged to have violated a citizen's constitutional rights. 403 U.S. 388, 397 (1971); *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70-74 (2001). For the Sisters to maintain a claim under the *Bivens* doctrine, at a minimum they must plead and prove two essential elements:  (1) that they have been deprived of rights secured by the Constitution or laws of the United States and (2) that the defendants who allegedly deprived them of those rights acted under color of *federal* law. *Bivens*, 403 U.S. at 397; *see also Vector Research, Inc. v. Howard & Howard Attorneys P.C.*, 76 F.3d 692, 698 (6th Cir. 1996).

The Sisters argue that their Amended Complaint sufficiently notified Mary McCord and David Bethel that they were asserting a *Bivens* claim against them. Specifically, the Sisters

claim that their Amended Complaint alleged that McCord and Bethel were federal actors who were personally involved in conduct that violated their constitutional rights. At the district court level they also argued that Bethel and McCord should have been notified of the *Bivens* claim because the Amended Complaint alleged both constitutional violations *and* § 1983 claims.

If the Sisters did intend to assert a claim under the doctrine set forth in *Bivens*, a review of the Amended Complaint shows that they could hardly have made that intention less clear. Starting with the jurisdiction section of the complaint, the Sisters stated, "[t]his Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 1331, 1343 and 2201 to secure rights under 42 U.S.C § 1983 and 42 U.S.C § 2000e-5(f)(3) as plaintiffs seek remedies of violations of the constitutional guarantees granted by the First, Fifth, and Fourteenth Amendments to the United States Constitution." [R. 37 at 2]. The Sisters' complaint omits any reference to *Bivens* and clearly indicates that they are asserting their constitutional claims under Title VII and § 1983. Indeed, the Sisters proceed to specifically label counts of the Amended Complaint as raising claims under Title VII and § 1983 with no mention of *Bivens*. Each count under § 1983 begins with this or a similar heading: "Violations of the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983 – Deprivation of Right to Free Speech, Free Association, and Exercise of Religion under Color of *State* Law." [R. 37 at 16 (emphasis added)]. Substantively, under each of those headings the Sisters have recited the elements for a § 1983 action and even included the following paragraph:

> Pursuant to 42 U.S.C. § 1983 it is unlawful for any person who under color of any statute, ordinance, regulation, custom, or usage of any State subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding.

[R. 37 at 17]. It is difficult to see how counts employing this language could have placed Mary McCord or David Bethel on notice that they needed to defend against a *Bivens* claim.

It is true that the Amended Complaint does mention the federal government. The Sisters note that the Red Cross was created by federal charter and that its disaster relief work involved "[p]erforming the tasks of federal, state and local government . . . ." [R. 37 at 15]. However, these few fleeting references to the federal government in a lengthy complaint are insufficient to

place the McCord or Bethel on notice of a *Bivens* claim, let alone constitute sufficient factual allegations to make it plausible that McCord or Bethel were operating under color of federal law. This is especially true in light of the fact that much of the complaint is dedicated to expressly alleging that McCord and Bethel operated under color of state law and thereby transgressed § 1983.

It is also worth noting that even if the words of the complaint could be twisted to construe a claim under *Bivens*, such a claim would be fraught with other troubles. As an initial matter, the counts asserting § 1983 claims, which are those that most closely resemble a *Bivens* claim, do not differentiate between the Red Cross and Mary McCord or RCEMA and David Bethel. However, it is well established that *Bivens* actions may not be asserted against either federal agencies or private corporations. *Malesko*, 534 U.S. at 70-74. Further, the few references to federal agencies appear only in paragraphs discussing the Red Cross, and yet Mary McCord, the only named officer of the Red Cross, was sued in her "professional capacity." This court has previously found that plaintiffs may not recover on *Bivens* claims that are asserted against federal officers in their official capacity. *Berger v. Pierce*, 933 F.2d 393, 397 (6th Cir. 1991). In light of these deficiencies, the district court properly dismissed any *Bivens* claims that the Sisters purport to have raised.

F

Finally, we address a procedural matter. Over the Sisters' objections, the district court adopted the magistrate judge's recommendation that the deadlines in the court's scheduling order should not be further extended to accommodate additional discovery. The Sisters challenge this decision on appeal. Federal Rule of Civil Procedure 16 states that "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). District courts have broad discretion under the rules of civil procedure to manage the discovery process and control their dockets. *Wolotsky*, 960 F.2d at 1338. Therefore, this court reviews a district court's denial of additional time for discovery for abuse of discretion. *Audi AG v. D'Amato*, 469 F.3d 534, 541 (6th Cir. 2006) (citing *Plott v. Gen. Motors Corp.*, 71 F.3d 1190, 1197 (6th Cir. 1995)). In conducting that review, this court considers the following factors:

(1) when the moving party learned of the issue that is the subject of discovery; (2) how the discovery would affect the ruling below; (3) the length of the discovery period; (4) whether the moving party was dilatory; and (5) whether the adverse party was responsive to . . . prior discovery requests.

*Bentkowski v. Scene Magazine*, 637 F.3d 689, 696 (6th Cir. 2011) (quoting *Dowling v. Cleveland Clinic Found.*, 593 F.3d 472, 478 (6th Cir. 2010)).   Still, "[t]he overarching inquiry in these overlapping factors is whether the moving party was diligent in pursuing discovery." *Id.*

On December 9, 2011, the district court set August 30, 2012 as the deadline for conducting discovery.  The Sisters did not send requests for discovery until August 9, 2012.  Though noting that the Sisters had not shown good cause, the court continued the discovery deadline until October 20, 2012.  However, the court warned that no further extensions would be granted.  After struggling to secure certain documents from the Red Cross and to schedule depositions with their agents, the Sisters filed a motion to compel. Subsequently, the parties tendered an agreed motion for a further extension in which the Sisters agreed to withdraw the motion to compel in the event that the extension was granted.  The court extended the discovery deadline to December 14 and denied the motion to compel based on the Sisters' representations.  The court again warned that it would grant no further extensions of the discovery deadline.  The Red Cross answered the discovery requests but subsequent deposition testimony revealed that some of the requested documents had not been produced.  Additionally, though some of the requested individuals were made available for depositions, the parties were unable to depose several others.  To further accommodate these discovery matters, the parties moved for a further extension on December 14, which the court denied.  The Sisters again moved to extend the discovery deadline on February 19, 2013.  The magistrate judge recommended that the motion be denied, and the district court adopted that recommendation.

The Sisters now argue that the reason they waited so long to make their initial discovery requests was that there was a motion to dismiss pending and they wanted to see the results of that motion before they proceeded with discovery.  After the initial extensions, the Sisters claim that they were unable to accomplish their discovery goals because of a lack of cooperation from the Red Cross.  However, even in light of these two facts, the Sisters were clearly not diligent in pursuing discovery.  The Sisters waited nearly nine months to submit their initial discovery

requests, which were served only a few weeks before the discovery deadline. This dilatory behavior was not justified by the pending motion to dismiss because the court's standing order expressly warned the Sisters that they "should not presume that a pending motion relieves them of their obligation to conduct discovery within the deadlines set forth by the case schedule." [R. 125 at 4]. Altogether, the discovery period in this case was extended twice and lasted over a year. The Sisters were well aware of their need to depose the relevant individuals during that entire period because most of them were named in the Complaint. Further, the Sisters have provided no information suggesting that acquiring the desired discovery would alter the outcome of the motion for summary judgment in any way. Finally, while the Red Cross might have been less than cooperative, the Sisters could have, at any time in the year-long discovery period, moved to compel them to act. The record indicates that their only motion to compel was essentially withdrawn when an extension was granted. Because the Sisters did not diligently pursue discovery, the district court did not abuse its discretion in denying them additional time.

III

Accordingly, for the aforementioned reasons, we AFFIRM the well-reasoned decisions of the district court.