RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0031p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

DANIEL THOMAS; ANNA THOMAS; CHAD BURLEY, individually and as a father and legal guardian of LAB, LGB, SB, and JB, minors; RUSSELL MOORE; LORI BURLEY; JESSICA ROSE, individually and as a mother and legal guardian of GM, a minor,

          *Plaintiffs-Appellants,*

      *v.*

NATIONWIDE CHILDREN'S HOSPITAL; THE CENTER FOR FAMILY SAFETY AND HEALING; THE CENTER FOR CHILD AND FAMILY ADVOCACY; DR. FARAH WADIA BRINK; DR. JONATHAN THACKERAY; FRANKLIN COUNTY CHILDREN SERVICES; DR. COREY J. ROOD,

          *Defendants-Appellees.*

> No. 17-3631

———————————

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:14-cv-01236—Edmund A. Sargus, Jr., Chief District Judge.

Argued: January 30, 2018

Decided and Filed: February 14, 2018

Before: SUHRHEINRICH, SUTTON, and BUSH, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** C. Benjamin Cooper, COOPER & ELLIOTT, LLC, Columbus, Ohio, for Appellants. William G. Porter, VORYS, SATER, SEYMOUR AND PEASE LLP, Columbus, Ohio, for Nationwide Children's Hospital Appellees. Nick A. Soulas, Jr., FRANKLIN COUNTY, Columbus, Ohio, for Appellee Franklin County. **ON BRIEF:** C. Benjamin Cooper, Barton R. Keyes, COOPER & ELLIOTT, LLC, Columbus, Ohio, for Appellants. William G. Porter, Martha Brewer Motley, Angelyne Lisinski, VORYS, SATER, SEYMOUR AND PEASE LLP, Columbus, Ohio, Steven W. Tigges, Ariel A. Brough, ZEIGER, TIGGES & LITTLE LLP,

Columbus, Ohio, for Nationwide Children's Hospital Appellees.  Nick A. Soulas, Jr., Jesse W. Armstrong, FRANKLIN COUNTY, Columbus, Ohio, for Appellee Franklin County.

_____

**OPINION**

_____

SUTTON, Circuit Judge.  Medical personnel treated three infants, between 19-days old and six-months old, in the emergency room of Nationwide Children's Hospital for serious injuries, including skull fractures and a broken leg.  Nationwide's physicians suspected child abuse, and they conducted x-rays, a CT scan, and blood testing to identify additional injuries, after which they alerted Franklin County Children Services of their concerns.

The parents of the infants filed a § 1983 claim against Nationwide and the County (among others), alleging that the medical testing violated their children's Fourth (and Fourteenth) Amendment right to be free from unreasonable searches and their own Fourteenth Amendment right to familial association.  The district court granted summary judgment to Nationwide and the County.  Because state action did not prompt Nationwide, a private hospital, to perform the diagnostic tests, because the County had nothing to do with the tests, and because the parents at any rate consented to the tests, we affirm.

I.

This dispute stems from the treatment of three infants at Nationwide Children's Hospital in 2013 and 2014: 19-day-old Luke Burley, three-month-old Evan Thomas, and six-month-old Gabriella Rose.

*Luke Burley*.  On July 27, 2014, Luke Burley's father brought him to Nationwide Children's emergency department.  Luke had suffered two skull fractures, one on each side of his head.  Luke's parents speculated that the injury occurred ten days earlier when Luke rolled off the sofa and fell onto the carpet.  But Nationwide physicians concluded that such a fall could not account for the severity of Luke's fractures or for the persistent swelling ten days later.  That Luke's parents waited ten days to seek care also concerned the physicians.

Nationwide physicians suspected that Luke's injuries were the result of child abuse and, in accordance with hospital protocol, took several measures. They ordered three additional diagnostic tests for Luke: a skeletal survey x-ray, a head CT scan, and a blood test. They recommended that Luke's two younger siblings, Jacob and Suzanna, be brought in for the same tests, to which Luke's parents agreed. And they reported their suspicions to Franklin County Children's Services as mandated by state law. Ohio Rev. Code Ann. § 2151.421(A)(1)(a).

The County investigated Luke's case, substantiated the child abuse suspicion, and designated his case for "ongoing supportive services." R. 146-7 at 1. Luke's parents did not appeal the disposition.

*Evan Thomas*. On May 23, 2013, Evan Thomas arrived at Nationwide with a fractured femur. Evan's mother reported that the injury occurred four days earlier when she bent over at church with Evan strapped to her chest in an infant carrier. She claimed that she heard a pop and then a scream. When Evan's mother took him to their family doctor the next day for a fever, she did not mention the church incident. Nationwide physicians concluded that the fracture was likely caused by torqueing—a turning or twisting force. Due to the nature of the injury and the delay in seeking treatment, the physicians feared child abuse.

Nationwide physicians performed the same diagnostic tests they ran on Luke Burley, recommended that Evan's parents bring in his two-year-old brother Sam for medical evaluation, and reported their suspicions to the County. Evan's mother agreed with the physicians' recommendation and brought Sam in for evaluation. The County conducted an investigation and found no evidence of child abuse.

*Gabriella Rose*. On April 19, 2014, an urgent care center sent Gabriella Rose to Nationwide's emergency department after it diagnosed her with a skull fracture on the left side of her head. Gabriella's mother believed the skull fracture happened four days earlier when Gabriella fell off the kitchen table while in a baby seat. She found Gabriella lying on her right side after the fall, but physicians noticed that the fracture appeared on the left side of Gabriella's skull. Gabriella's mother took her for a checkup to their family physician the same day but did not disclose the fall. The physicians feared that child abuse caused the injury.

Nationwide again ordered a skeletal scan, CT scan, and blood work and reported their suspicions to the County child services agency. The County conducted an investigation. The record does not disclose the outcome of this investigation.

In late 2014, Luke, Evan, and Gabriella's parents filed a § 1983 claim against Nationwide Children's Hospital, several of its affiliates and doctors (the Center for Family Safety and Healing, the Center for Child and Family Advocacy, Dr. Farah Wadia Brink, Dr. Jonathan Thackeray, and Dr. Corey Rood), and Franklin County Children Services. The parents claimed that the defendants violated their children's Fourth Amendment right to be free from unreasonable searches and seizures and their own Fourteenth Amendment right to familial association by conducting medical tests on their children. The district court granted summary judgment to Nationwide, its affiliates, and the County. The parents appealed.

II.

As this case comes to us on summary judgment, we ask whether a genuine issue of material fact requires a trial or whether one party should win as a matter of law. Civil Rule 56(a). We review the question with fresh eyes and draw all reasonable factual inferences in favor of the parents, who lost below. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

To prevail under § 1983, the parents must show that Nationwide, its doctors and affiliates, and the County acted under color of state law and that their actions caused the violation of a federal right. 42 U.S.C. § 1983. For a variety of reasons, the parents come up short with respect to each defendant.

*Lack of state action with respect to all defendants (except the County).* By its terms, § 1983 requires an act "under color of any statute, ordinance, regulation, custom, or usage, of any State." *Id.* Nationwide, its doctors, and its affiliates are private entities. They are not organs of the State, and their employees do not work for the State. Private action, it is true, may still count as state action under discrete circumstances, such as when the State exercises "coercive power" over the private entity, the State provides "significant encouragement, either overt or covert" to the private entity, or the private actor operates as a "willful participant in joint

activity with the State or its agents." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (quotation omitted). But the frequent reality that the State regulates private entities or cooperates with them does not transform private behavior into state behavior. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974); *Marie v. Am. Red Cross*, 771 F.3d 344, 363 (6th Cir. 2014).

The parents challenge three actions taken by the hospital and its staff: the diagnostic x-rays, CT scans, and blood tests. They claim that the tests amounted to unreasonable searches of their children under the Fourth Amendment and deprived them of their Fourteenth Amendment "right to make decisions regarding medical procedures for their children." Appellants' Br. at 52.

But Nationwide and its physicians did not order the tests because they felt the coercive will of the State bearing upon them. They did so because medical standards of care prompted their use. The skeletal surveys were necessary to identify hidden fractures, the CT scans for hidden intracranial trauma, and the blood testing for abdominal bleeding.

Two medical experts provided unchallenged testimony in support of this defense: Dr. Shapiro, a professor of clinical pediatrics and director of a hospital child abuse team, and Dr. Lindberg, a practicing, board certified emergency medicine physician and child abuse physician. Dr. Shapiro reported that the "diagnosis of child abuse in the pediatric emergency department is critically important in order to prevent future injury and possibly death" and that the "physical examinations, CT scans, skeletal surveys, and serum testing that was obtained in the children were medically indicated because child abuse was suspected." R. 155-3 at 1, 7. Dr. Lindberg confirmed that "[a]ll testing and treatment performed was medically necessary." R. 155-12 at 1. "Just as it would be malpractice . . . to give a blood transfusion without considering whether the patient had . . . serious internal bleed[ing]," Lindberg analogized, "it would be irresponsible for a physician to treat a sentinel injury in a young infant without taking reasonable steps to exclude abuse." *Id.* at 7.

The parents offer nothing to controvert this expert testimony and thus fail to raise a meaningful factual dispute. They instead try to link these private decisions to the State in several other ways.

They first emphasize that Ohio law requires every health care professional who "has reasonable cause to suspect" that a minor "has suffered or faces a threat of suffering" child abuse to report that suspicion to the State. Ohio Rev. Code Ann. § 2151.421(A)(1)(a). That is of course a state law, and the law requires action by health care professionals. But this reporting duty is not unique to medical personnel; it also applies to attorneys, teachers, school psychologists, and day care employees, among others. *Id.* § 2151.421(A)(1)(b). Most critically, however, this state law establishes a duty to report, not a duty to investigate—and thus not a duty to conduct a CT scan or any other test. In this setting, the duty to report does not make Nationwide and its doctors state actors any more than it makes private school teachers, private attorneys, and private day-care facilities state actors.

The parents add that in all three cases the physicians conducted the diagnostic tests after developing a suspicion of child abuse but before reporting their suspicion. So, they say, that suggests the physicians intended to build a file on the parents before contacting the State. But this sequence helps Nationwide. It shows that the State did not know about Luke, Evan, or Gabrielle's injuries until *after* the doctors completed the diagnostic tests, making it less likely that a state actor ordered the tests.

The parents point to a Memorandum of Understanding issued for the Center for Family Safety and Healing, which establishes child-abuse protocols. But the Center remains a separate legal entity from Nationwide. It is an accredited Child Advocacy Center that provides resources and services, not medical care, to families affected by child abuse, with a focus on sexual abuse. Although some of the Nationwide physicians work at the Center, the Center never claimed that any of these children was a victim of sexual abuse and never treated any of the victims.

The parents add that the voluntary "safe discharge plans" that the County arranged with the parents suggest state involvement with the diagnostic tests. R. 156-1 at 3. But the County's safe discharge plans addressed only safety threats associated with the child's return home from the hospital. To take one example, Gabriella's safety discharge plan said that her grandmother should stay at home with her parents for a period of time. The plans had no impact on the treatment the children received at the hospital or when the hospital medically discharged them. The physicians remained in charge of those decisions.

The parents rely on letters to other parents in which Nationwide notes that "State law requires that we investigate all cases where there is any suspicion of abuse." R. 178-2; R. 178-3. But these letters were sent by individuals with no authority over patient care, namely a family relations coordinator and hospital counsel. More importantly, they do not say that state law mandated the diagnostic tests at issue, as indeed it does not. In view of what § 2151.421 in truth requires, the letters are best read as referring to the mandatory reporting protocols and subsequent state investigation. That presumably is why they separately note that the child's treatment was consistent with the medical standard of care.

*United States v. Booker* does not alter this conclusion. 728 F.3d 535 (6th Cir. 2013). It characterized a private doctor as a state actor when he performed a rectal exam to remove crack cocaine from a suspect that the police brought to the hospital. The reasoning in *Booker* was circumstance-specific, and those circumstances have no application here. It concluded that the doctor "must be treated as a government agent for Fourth Amendment purposes because the suspect was in the physical control of the police, the police knew what [the doctor] was going to do, the police knew that [the suspect] did not consent, and a reasonable police officer would know that the doctor did not, independent of police direction, have the legal authority to intubate and paralyze the suspect without his consent." *Id.* at 541. In this instance, the police never took Luke, Evan, or Gabrielle into official custody even after the diagnostic tests, let alone brought them to the hospital to recover evidence of child abuse.

*Lack of causation with respect to all defendants.* A separate flaw in these claims turns on causation. Section 1983 does not permit individuals to sue state actors in the abstract; it requires them to connect alleged constitutional violations of the individuals' rights to state conduct. *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982). But no evidence of causation exists here with respect to the constitutional injuries—the taking of the tests—with respect to any of the defendants. As just shown, Nationwide's physicians would have conducted the same diagnostic tests even in the absence of a reporting statute or for that matter even in the absence of any child abuse laws at all. All of the evidence shows that the doctors performed these tests because the medical standards of care required them, not because state law mandated the tests.

When state action is not even a but-for cause, let alone a proximate cause, of an injury, a § 1983 claim necessarily fails as a matter of law.

Section 1983 serves to deter state actors from using their badge of authority (sometimes literally) to deprive individuals of their federally protected rights. *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). But applying this remedy to conduct—whether by Nationwide, its doctors and affiliates, or the County—that did not cause the alleged injuries does not further that goal. And introducing the strictures of the Fourth Amendment to care performed in the pediatric emergency room, in the absence of a pre-existing law enforcement investigation, would serve only to chill physicians from exercising their professional judgment to administer care they deem medically necessary for a child in need of help. Neither § 1983 nor the Constitution requires any such thing.

*Existence of consent with respect to all defendants.* One other problem undermines this lawsuit. The parents consented to the same tests they now sue the hospital for performing.

No one has to assert federal or state constitutional rights. Citizens retain the liberty to invoke them when they wish. In the context of the Fourth Amendment, individuals may waive their Fourth Amendment rights by consenting to a search so long as they consent freely, voluntarily, and knowingly. *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). Function, not form, carries the day. Consent may be given in words, conduct, even gestures. *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004). The scope of consent is determined by a reasonableness standard: How would the prototypical everyman or everywoman see it? *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Parents may waive the Fourth Amendment rights of their non-adult children. *See Georgia v. Randolph*, 547 U.S. 103, 114 (2006); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1207 (10th Cir. 2003).

All of the parents in this case signed a consent form, prior to treatment, saying:

> I and/or my parent(s) or guardian(s)[] consent to let the doctors, nurses, and employees of Nationwide Children's Hospital, attending doctors and other doctors (or assistants/designees) or persons, do all things that may be needed to diagnose, treat and care for the needs of [the] above-referenced patient.

R. 145-5 at 1.  The parents acknowledged that they signed this consent form—permitting the doctors to "do all things . . . needed"—freely and voluntarily.  And the record confirms that each test was "needed to diagnose, treat and care" for the children.

At least one parent of each child attended all of the medical tests, except in one instance when Evan's mother left the testing site to use the restroom just before the CT scan started.  The parents did not object to any of the procedures as medical personnel administered them.  On this record, any doctor would have good reason to think the parents consented to the tests.

Perhaps it's fair to wonder whether the parents knew that Nationwide had a legal duty to report suspicions of child abuse, which the results of the tests might have triggered.  But such a lack of knowledge seems unlikely given the common knowledge of child abuse reporting laws and their prevalence in all fifty States.  *See Making and Screening Reports of Child Abuse and Neglect*, U.S. Children's Bureau (2017), https://www.childwelfare.gov/pubPDFs/repproc.pdf.  Plus, individuals are generally held responsible for knowing the law.  *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 581 (2010).  Either way, it was the x-rays and blood work, not the subsequent reporting, that allegedly caused the Fourth Amendment violation.  That these diagnostic tests may have eventually led to a state investigation is beside the point when, as here, the parents consented to the medical treatment of their children and all of the tests conducted were medically necessary.  The tests just as easily could have identified a latent, life-threatening injury and thus are squarely within the scope of the parents' consent.

*Ferguson v. City of Charleston*, 532 U.S. 67 (2001), does not change our minds.  The hospital staff in that case implemented a policy that required testing for cocaine through a urine drug screen for pregnant patients.  *Id.* at 70.  The Court held that the urine tests were Fourth Amendment searches that could not be justified by programmatic "special needs."  *Id.* at 84–86.  But two features of *Ferguson* undermine its extension here.  The case involved a public hospital and thus necessarily involved state action, and indeed arose from an initiative by the local prosecutor to arrest pregnant users of cocaine under child abuse laws.  *Id.* at 70–71.  And *Ferguson* remanded on the issue of consent, holding only that nonconsensual urine tests violated the Fourth Amendment.  *Id.* at 76.

True, the Court noted that, "when [hospital staff] undertake to obtain such evidence from their patients *for the specific purpose of incriminating those patients*, they have a special obligation to make sure that the patients are fully informed about their constitutional rights." *Id.* at 85 (emphasis original). But in *Ferguson*, the hospital had a clear investigatory purpose, as confirmed by a policy indicating the precise drug offense with which a pregnant woman should be charged depending on the stage of her pregnancy. *Id.* at 72. No such evidence exists in this record. Nationwide conducted the diagnostic tests to help Luke, Evan, and Gabrielle medically, not to incriminate their parents personally.

For the same reasons, the parents' familial association claims fail as well. Their consent to the tests prohibits them from claiming that the defendants deprived them of control over their children's medical care.

As *Ferguson* and this case show, it sometimes will be the case that the state action, causation, and consent issues intertwine and thus rise or fall together. Had the County conscripted Nationwide as an investigative arm of the State, the physicians' actions would be state action, and under *Ferguson* their behavior would fall outside the scope of consent given by the parents. But the parents fail to present any evidence that this case involves anything other than private physicians treating patients under the appropriate medical duty of care.

We affirm.