RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0040p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

DAVID A. CIRACI; CARLA GROSJEAN; MEGAN L. MORR; JOSEPH M. ADAMS,

         *Plaintiffs-Appellants*,

    *v.*

J.M. SMUCKER COMPANY,

         *Defendant-Appellee*.

No. 22-3462

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Akron.
No. 5:21-cv-02347—John R. Adams, District Judge.

Argued: January 26, 2023

Decided and Filed: March 14, 2023

Before: SUTTON, Chief Judge; CLAY and BUSH, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ARGUED:** Warner D. Mendenhall, MENDENHALL LAW GROUP, Akron, Ohio, for Appellants. Tracy K. Stratford, JONES DAY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Warner D. Mendenhall, MENDENHALL LAW GROUP, Akron, Ohio, for Appellants. Tracy K. Stratford, JONES DAY, Cleveland, Ohio, Yvette McGee Brown, JONES DAY, Columbus, Ohio, for Appellee.

─────────────────

## OPINION

─────────────────

    SUTTON, Chief Judge. Four employees of the J.M. Smucker Company sought religious exemptions from the company's vaccine requirements. When the company refused, they filed this free-exercise claim under the First Amendment against Smucker's. Constitutional

guarantees conventionally apply only to entities that exercise sovereign power, such as federal, state, or local governments, and, in some other instances, tribal governments. Smucker's may be a big company. But it is not a sovereign. Even so, did Smucker's become a federal actor—did it exercise sovereign power?—for purposes of this free-exercise claim when it sold products to the federal government and when it imposed the vaccine mandate because the federal government required it to do so as a federal contractor? No, as the district court correctly held. We affirm.

I.

Jerome Monroe Smucker founded the J.M. Smucker Company in 1897, "selling apple cider and apple butter [from] the back of his horse-drawn wagon." The J.M. Smucker Company, *Encyclopedia of Cleveland History*, https://tinyurl.com/jydeev5s (last visited Mar. 13, 2023). Today, Smucker's sells jelly, jam, peanut butter, pet food, and coffee in all fifty states and around the world. Four in five American pantries contain Smucker's products.

During World War II, the Army added Smucker's apple butter to GIs' ration kits. Smucker's has supplied apple butter and other items to the federal government ever since, making it a federal contractor.

In 2021, by Executive Order and related guidance, President Biden directed all federal contractors to "ensure that all [their] employees [were] fully vaccinated for COVID-19," unless such employees were "legally entitled" to health or religious accommodations. *Kentucky v. Biden*, 23 F.4th 585, 589–90 (6th Cir. 2022); *see* 86 Fed. Reg. 50985, 50985 (Sept. 14, 2021); Safer Federal Workforce Task Force, *COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors* (Sept. 24, 2021), https://tinyurl.com/ynf3c8kw (hereinafter *Guidance*). The order made contractors "responsible for considering, and dispositioning, such requests for accommodations." *Guidance* at 10.

Smucker's responded in two steps. On September 10, 2021, it notified its U.S. employees that it would "ask and expect" them to "be fully vaccinated." R.1-1 at 1. It emphasized that this step involved "a vaccine expectation, and not a mandate," but warned that "a mandate [was] on the horizon." *Id.* Then, a month later, in the face of "deadlines in the federal order," Smucker's announced a formal vaccine mandate. R.1-2 at 1. Consistent with the

Executive Order, Smucker's promised that it would recognize exemptions to its mandate based on "sincerely held religious beliefs." R.1-3 at 8.

David Ciraci, Carla Grosjean, Megan Morr, and Joseph Adams all worked at Smucker's. They each sought religious exemptions from the vaccine mandate. After Smucker's denied them, they sued the company under the free-exercise guarantee of the First Amendment. The district court dismissed their claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. This appeal followed.

II.

When Smucker's denied the claimants' request for a religious exemption, did it do so as a state actor? Not in our view. Smucker's does not perform a traditional, exclusive public function; it has not acted jointly with the government or entwined itself with it; and the government did not compel it to deny anyone an exemption. That Smucker's acted in compliance with a federal law and that Smucker's served as a federal contractor—the only facts alleged in the claimants' complaint—do not by themselves make the company a government actor.

Constitutions simultaneously empower and constrain. At the same time that they authorize various branches of government to exercise sovereign power, they limit that power in lots of ways, including through election requirements, tenure provisions, process-based requirements for making laws, and, most relevant for today, explicit constraints on the exercise of power. The first eight provisions of the Bill of Rights offer the most prominent example of constraints on government. Whether it is the Bill of Rights in general or the First Amendment in particular, these constraints typically protect citizens from the government, not from each other. *Manhattan Comm. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019). It is the rare federal constitutional guarantee—the prohibition on involuntary servitude counts as a glaring exception, *see* U.S. Const. amend. XIII—that regulates solely private conduct.

Things could scarcely be otherwise with respect to most constitutional constraints. Take the Speech Clause. It forbids viewpoint-based limitations on speech, but private publications like the *New York Times* or *Wall Street Journal* may favor certain viewpoints or speakers.

*Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974). The Free Exercise Clause likewise forbids discrimination based on religion, but the Catholic Church need not pick rabbis or imams to run its seminaries. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020). And so on and so forth. Applying ordinary First Amendment rules beyond the government would warp traditional principles of ordered liberty—impairing individual liberty and offering little order in return.

By way of contrast, many federal statutes regulate private conduct and some even protect certain values that the Free Exercise Clause protects. The claimants, for example, could have separately filed a claim under Title VII of the 1964 Civil Rights Act, Pub. L. 88-352, 42 U.S.C. § 2000e *et seq*. It bars private employers from discriminating against employees based on their faith, among other protected categories. 42 U.S.C. § 2000e-2(a). The claimants, notably, filed complaints with the EEOC under Title VII. At the same time, the claimants could have sued the federal government, which created the vaccine mandate for federal contractors. But they did not, requiring us to determine whether Smucker's counts as a government actor.

In holding the constitutional line between constraining government and constraining private entities, the federal courts ask whether "the specific conduct of which [a] plaintiff complains" is "fairly attributable" to the government. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999); *see Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). Two sets of principles guide our answer. The first turns on the aggregated answers to three inquiries. Does the private company's conduct involve a traditionally exclusive governmental function? *Halleck*, 139 S. Ct. at 1928–29. Is that conduct "entwined with" government decisions or fairly attributable to the government based on a close "nexus" between the state and the challenged conduct? *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001); *see also Marie v. Am. Red Cross*, 771 F.3d 344, 362–63 & n.6 (6th Cir. 2014) (noting that this court has treated the "entwinement" and "nexus" tests as related). Has the government compelled the company's action? *Peterson v. City of Greenville*, 373 U.S. 244, 248 (1963); *Thomas v. Nationwide Children's Hosp.*, 882 F.3d 608, 612 (6th Cir. 2018). The second cuts across all three inquiries and serves as something of a safe harbor. So long as a private company's actions turn on compliance with a state or federal law, that does not by itself make the company a state actor.

A.

*State-action inquiries.* "[N]o one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient." *Brentwood Acad.*, 531 U.S. at 295. Still, we often gauge state actor status by asking three questions: does a private company's conduct concern traditionally exclusive governmental functions, reflect entwinement, a nexus, or joint action with state officials, or involve compulsion by the government? *See Halleck*, 139 S. Ct. at 1928. None indicates that Smucker's exercised sovereign power.

The first inquiry—does the service involve a traditional governmental function?—does not help the claimants. To qualify "as a traditional, exclusive public function," the government "must have traditionally *and* exclusively performed the function." *Id.* at 1929. For instance, private organizations become state actors when they administer public elections. *Smith v. Allwright*, 321 U.S. 649, 663–65 (1944); *Nixon v. Condon*, 286 U.S. 73, 84–89 (1932). But nothing of the sort happened here. We have never relied on the government to make jelly, peanut butter, and other products in the Smucker's lineup. *See, e.g.*, Louisa M. Alcott, *Little Women* 221–23 (Little, Brown & Co. ed. 1922) (1868) (jelly); G.W. Carver, *How to Grow the Peanut: And 105 Ways of Preparing It for Human Consumption* 19 (2d ed. 1917) (peanut butter). Making jam simply is not a government function, whether by tradition or by the most up-to-date notions of what our governments should do.

That Smucker's carried out the government's vaccine mandate in the course of making jam does not change anything. In the first place, the inquiry focuses on the entity's underlying service, not the government's regulatory mandate. Otherwise, the inquiry would collapse into a public function each time a regulation covered the topic. In the second place, claimants cannot satisfy even this friendly re-framing of the issue. A vaccine mandate does not count as "a public function traditionally handled just by the State." *Howell v. Father Maloney's Boys' Haven, Inc.*, 976 F.3d 750, 752 (6th Cir. 2020). It is hardly unheard of for private companies to make vaccination a condition of employment. *See, e.g.*, W.A. Evans, *State of Chicago's Health*, City of Chi. Bulletin of the Dep't of Health, May 18, 1907, at 2 (smallpox); Carol Christian, *Houston Hospital Workers Take Mandatory Flu Shots in Stride*, Houston Chronicle (Jan. 19, 2013)

(influenza). No matter how you test them, Smucker's products and its actions do not amount to the kinds of functions that governments alone traditionally perform.

The second inquiry—have the actions of the government and private entity become so entwined as to amount to a form of collective state action?—does not move the needle either. Entwinement may arise when a private entity partners with, directs, or is controlled by government officials. Consider some examples. A merchant becomes entwined with the government when it directs a county sheriff to attach a customer's property. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 926 (1982). An athletic association becomes entwined with the government when public schools govern, operate, and fund it. *Brentwood Acad.*, 531 U.S. at 299–302. And a private store becomes entwined with the government when it conspires with government officials to segregate its facilities or acts in accordance with unofficial, unlawful, and state-enforced customs of segregation. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 174 & n.44 (1970).

Again, nothing of the sort happened here. Smucker's has not partnered, conspired, or entered into a "joint venture[]" with federal officials. *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 177 (1972); *cf. Adickes*, 398 U.S. at 152–53. It did not deny the claimants' request for an exemption using federal officials' assistance. *Compare Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 164–65 (1978), *with Lugar*, 457 U.S. at 941–42. Nor has it connected itself to joint action with the government in some other cognizable way. Yes, it has contracted with the federal government. But federal contracts by themselves do not create the requisite entwinement. *Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982); *see Howell*, 976 F.3d at 755. The same could be said of many private companies that do business with the federal government and yet have long been treated as private rather than public actors.

That leaves the last inquiry. Did Smucker's deny the claimants an exemption because the government "compel[led]" it to do so, *Halleck*, 139 S. Ct. at 1928, or offered it "such significant encouragement . . . that [its] choice must in law be deemed to be that of the State," *Blum*, 457 U.S. at 1004? The Supreme Court's cases typically look to this inquiry in a distinct setting, one in which the claimant seeks to sue the state or federal government and uses the actions of a private entity to connect the lawsuit to the government. *See, e.g.*, *id*. at 995–96 (involving

lawsuit by nursing home residents against New York State officials); *Skinner v. Ry. Labor Execs. Ass'n*, 589 U.S. 602, 609 (1989) (involving lawsuit by railroadmen's union against federal officials). The idea is that the government cannot escape responsibility for *its own* actions by farming out tasks to private entities, lest the Constitution's constraints become a "dead letter." *See United States v. Ackerman*, 831 F.3d 1292, 1300–01 (10th Cir. 2016) (Gorsuch, J.).

But that is not today's problem. We are not being asked whether implementation of a federal vaccine mandate amounts to state action sufficient to sue the *government.* It is whether Smucker's itself counts as the government. Had the claimants sued the federal government, this would be a different case.

By comparison, in cases in which a claimant brings action against a private actor, that "plaintiff must allege . . . that state officials coerced or participated in the company's decision-making to the extent required to trigger state actor status." *Wilcher v. City of Akron*, 498 F.3d 516, 520 (6th Cir. 2007). To assess coercion, we examine "the specific conduct of which [the claimants] complain[]," meaning the denial of their religious exemptions. *Sullivan*, 526 U.S. at 51. In this case, the federal government never required Smucker's to vaccinate the claimants, for the Executive Order did not tell Smucker's to deny exemptions to anyone. It told Smucker's to *grant* religious exemptions to those legally entitled to them, and let Smucker's decide on its own who qualified. *See Guidance* at 10. The claimants contend that Smucker's has exercised its discretion under the Executive Order stingily, not that Smucker's has been dragooned by the government into denying an exemption.

*Blum* reached a similar conclusion on parallel facts. 457 U.S. at 991. State regulations directed nursing homes to provide residents with "appropriate level[s]" of medical care, but they left individual doctors to decide *which* care was appropriate. *Id.* at 1006–09. The Supreme Court held that the doctors' care decisions—their choices to transfer patients between nursing homes—did not amount to state action. *Id.* It reasoned that the State's general directive to provide appropriate care did not compel any particular transfer decision. *Id.* at 1008 & n.19. The same conclusion applies here. As in *Blum*, the President's Executive Order gave Smucker's discretion to decide which of its employees merited religious exemptions. When Smucker's exercised that discretion, the government did not coerce it.

In resisting this conclusion, the claimants emphasize that the district court dismissed their action under Civil Rule 12(b)(6), requiring us to assume the truthfulness of the factual allegations in their complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But even if the claimants plausibly pleaded coercion generally, they have pleaded *nothing* specifically that shows the federal policy "dictated" their employer's decision to deny their exemptions. *Blum*, 457 U.S. at 1009.

The claimants object that the standard announced in *Blum* applies only to government defendants, and that a looser approach befits suits against private entities. If anything the opposite is true, as *Crowder v. Conlan* explains. 740 F.2d 447, 450 (6th Cir. 1984). In *Crowder* a doctor sued his private employer, a nursing home, for disciplining him. *Id.* at 448–49. He alleged that his employer acted for the State because, among other aspects of the case, the State heavily regulated it, *id.* at 451, and he sought to distinguish *Blum* by arguing that it applied only to lawsuits against government entities, *id.* at 450. We rejected his claim, reasoning by analogy from *Blum*. *Id.* at 451. Because the doctor did not allege that the State had pressured his employer into disciplining *him*, *Blum* meant that the nursing home had not acted for the State. *Id.* So too here. A regulation that told Smucker's to *grant* religious exemptions did not compel it to *deny* them, even if we suppose that it compelled Smucker's at all.

### B.

*Compliance with federal law.* Consistent with our answer to all three inquiries and consistent with the Supreme Court's most recent case in this area (*Halleck*) is this safe-harbor reality: Smucker's did not become a state actor merely by complying with a generally applicable law.

When a private company complies with federal law, that does not by itself make the company a government actor. *See Halleck*, 139 S. Ct. at 1932. Else, every regulated private company would be a public entity, a conclusion that would come as a surprise to many and that would alter heaps of foundational precedents going back to the founding. *See, e.g.*, *Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. 518, 665–66 (1819). As the Supreme Court put the point nearly a half century ago, the run-of-the-mine reality "that a business is subject to state [or

federal] regulation does not by itself convert its action into that of the State" or the federal government. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974). The same is true of companies that do business with governments. As the Court put the point a few years ago: "Numerous private entities in America obtain government licenses, government contracts, or government-granted monopolies. If those facts sufficed to transform a private entity into a state actor, a large swath of private entities in America would suddenly be turned into state actors and be subject to a variety of constitutional constraints on their activities." *Halleck*, 139 S. Ct. at 1932. To be regulated does not make one a regulator. To sell to the government does not make one the government. Not even "extensive regulation" of a private company makes it a "state actor" by itself. *Id.*

Common experience and common sense confirm this conclusion. Federal law often directs firms to achieve particular outcomes. But we do not describe the private decisions that follow as state action. Under federal law, for example, Smucker's may not sell jam containing "filthy" or "unfit" berries. 21 U.S.C. §§ 331(b), 342(a)(3). When Smucker's rejects berries as "unfit," has it acted as the State? Must it afford its supplier due process before rejecting its berries? Doubly doubtful. When Smucker's separates the "fit" from the "unfit" berries, it acts privately rather than publicly, and it has no obligation to comply with the Constitution's due process imperatives.

Caselaw proves the point. The Supreme Court has told us on many occasions that conduct is not "fairly attributable to the State," *Sullivan*, 526 U.S. at 51, merely because a law or regulation induces it. Start with *Jackson*, in which a public utility shut down several delinquent customers' electricity without notice. 419 U.S. at 346–47. The utility held a certificate of convenience and necessity from the State of Pennsylvania, which had ordered the utility to supply power to Pennsylvanians and had approved a general tariff laying out the utility's termination practices. *Id.* at 354, 357. In a but-for sense, the dispute grew out of Pennsylvania law. Without Pennsylvania's approval of the applicable provision in its tariff, the utility could not have stopped providing electricity to anyone. *Id.* at 354–58. Yet the Court held that the utility did not act for the State when it ended the service. *Id.* Being a "heavily regulated . . .

utility"—even a government-sponsored monopoly, as is true for many utilities—did not make the utility a state actor. *Id.* at 358.

Turn to *Sullivan*, another case from Pennsylvania. The Keystone State authorized private unemployment insurers to withhold certain benefits pending review by a specialist board. 526 U.S. at 43. As in *Jackson*, the insurers' authority flowed from state law. Absent the Pennsylvania law, there would have been no unemployment insurance and no authority to withhold it. *Id.* at 44–48. Yet the Court found no state action when the insurers withheld benefits. *Id.* at 58. It emphasized that, even if "an alleged constitutional deprivation" involved "a rule of conduct imposed by the State," state action liability would not attach unless "the party charged with the deprivation" could "fairly be said to be a state actor." *Id.* at 50. The reality that the insurers exercised authority in conformity with state law did not make the insurers state actors. *Id.*

Turn to the recent decision in *Halleck*. New York City directed a private nonprofit corporation to operate its public access television channels. 139 S. Ct. at 1927. New York State "heavily regulate[d]" the corporation "with respect to the public access channels," to the point that the corporation retained scant "editorial discretion" about its own programming. *Id.* at 1931–32. But the Court rejected the position that these regulations made the corporation's programming decisions—decisions about whether particular citizens could make use of the public access channels—attributable to the government. *Id.* "[B]eing regulated by the State," it repeated, or for that matter being subjected to a State's "direct regulatory control," did not make private corporations state actors. *Id.* at 1932. The contrary view "would significantly endanger individual liberty and private enterprise." *Id.*

The lower courts, little surprise, hold to this line. Consider *Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826 (9th Cir. 1999). A federal law required an employer to collect a job applicant's Social Security number. *Id.* at 829–30. The applicant, thinking his Social Security number the "Mark of the Beast," refused and sued the employer under the First Amendment. *Id.* The Ninth Circuit rejected the claim. *Id.* It held that the employer had sought to collect the Social Security number in connection with a federal law and that compliance with

such laws did not make the employer a state actor. *Id.* at 836–44; *see also Sykes v. Bank of Am.*, 723 F.3d 399, 407 (2d Cir. 2013) (per curiam) (similar).

All of this makes sense, too. "[I]n the usual case," state action arises when "the State provide[s] a mantle of authority that enhance[s] the power of [a] harm-causing individual actor." *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 192 (1988). When government regulations demand a particular outcome, however, they deplete rather than enhance private power. Put another way, a company may not borrow sovereign powers without borrowing sovereign responsibilities. But a regulated entity does not borrow authority from any sovereign; that authority is imposed on it.

This principle—that compliance with federal law or status as a federal contractor by itself does not make a private entity a public one—cuts the heart out of claimants' case. At most, Smucker's required claimants to vaccinate themselves in accordance with the President's Executive Order. But compliance with federal law, without more, does not make private firms state actors. Just as Smucker's acts privately when it requires its suppliers to sell it fit rather than unfit berries, *see* 21 U.S.C. § 342(a)(3), so too when it requires employees to take vaccines that make them fit for work.

*Adickes* does not stand for a different rule. 398 U.S. at 144. It dealt with a department store that, in combination with a local police officer and in accordance with local segregation practices, had allegedly conspired to punish a white woman who ate with black citizens inside the store. *Id.* at 146–48, 170. The woman sued the store, and the Court found she had pleaded an adequate case for state action. *Id.* at 170–71. It emphasized that her lawsuit turned on an alleged conspiracy between the store and the police officer—an unquestioned state actor—and that the store had segregated its facilities at the bidding of local officials. *Id.*; *see id.* at 174 n.44. *Adickes* stands for the unremarkable proposition that a private entity may become a state actor when it conspires or acts jointly with state officials, not that private firms act for the State when they comply with state law. *Id.* at 174 n.44 (describing store as a "participant in joint activity with the State"); *see Sutton*, 192 F.3d at 840–41 (reading *Adickes* this way).

*Skinner* is of an inapposite piece. 589 U.S. at 602. The Federal Railroad Administration ordered railroads to drug test certain railmen. *Id.* at 609. A union representing the railmen sued the federal agency, and the Court held that the drug tests—though administered by private railroads—counted as state rather than private searches. *Id.* at 610–11, 614–15. *Skinner* holds only that private activities may expose the *government* to a constitutional claim when the government compels them. It does not hold that private entities, like railroads or jam companies, may be sued as state actors if they comply with the law's demands.

The same is true of *Crowder* and of some other cases in which plaintiffs attempt to trace private action to the government on a "coercion" theory. None of these cases involves generally applicable laws or regulations, and none of them finds state action in the acts of private parties. *See Crowder*, 740 F.2d at 450; *Wilcher*, 498 F.3d at 519–20; *Lansing v. City of Memphis*, 202 F.3d 821, 829–35 (6th Cir. 2000).

## C.

A few final observations. We have assumed so far that the claimants have a cause of action to litigate their First Amendment claims. But is that true? We ordinarily hear lawsuits alleging violations of federal civil rights under 42 U.S.C. § 1983. Section 1983, however, deals with violations by those acting "under color of . . . State" law. It does not generally cover federal officials. *Strickland ex rel. Strickland v. Shalala*, 123 F.3d 863, 866 (6th Cir. 1997). If Smucker's acted as a government official of *any* kind, it would have been as a federal official because Smucker's acted in conformity with a federal Executive Order, not Ohio law. That means § 1983 has no role to play.

To the extent the claimants seek damages directly under the First Amendment against a federal official, they must rely on the kind of implied cause of action created by *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). But extending *Bivens* is "disfavored," *Egbert v. Boule*, 142 S. Ct. 1793, 1803, 1805–06 (2022), and the Supreme Court has rejected *Bivens* claims "against private corporations acting under color of federal law," *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 71 (2001).

That leaves claimants' demands for a declaratory judgment, reinstatement, and other equitable relief. In equity, it is true, claimants sometimes may "sue to enjoin unconstitutional actions by state and federal officers" even in the absence of a statutory cause of action. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). But today's claimants seek more than a prohibitory injunction. They seek reinstatement and other affirmative relief. It is not clear whether, as a matter of historical equitable practice, we may infer, imply, or create a cause of action for such relief. But because the parties have not briefed or argued these points and because they do not go to our jurisdiction, we need not decide them today.

We affirm.